IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNIVERSITY OF PITTSBURGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07-CV-00491 |
| | ) | |
| | ) | |
| VARIAN MEDICAL SYSTEMS, INC., | ) | Hon. Arthur J. Schwab |
| | ) | |
| Defendant. | | |

REPORT AND RECOMMENDATION OF SPECIAL MASTER

Pending before the Special Master in this patent infringement action is the motion of defendant, Varian Medical Systems, Inc., (Varian), for summary judgment for lack of standing, or in the alternative, a motion for a preliminary hearing on the issue.

I.     **INTRODUCTION AND PROCEDURAL HISTORY**

This patent infringement action involves the two patents-in-suit, e.g., U.S. Patent Nos. 5,727,554 (the 554 patent), and 5,784,431 (the 431 patent). Plaintiff, the University of Pittsburgh, (UPitt), filed a complaint on April 13, 2007, and Varian filed an answer and counterclaim on May 14, 2007. On June 4, 2007, the District Court entered a case management order requiring that, among other things, fact discovery shall be completed on or before October 5, 2007. Following the entry of that order, the parties engaged in intensive fact and expert discovery, as well as motion practice on various discovery-related issues. In addition, the parties submitted *Markman* briefs and a Joint Disputed Claim Terms Chart. A *Markman* hearing was held on November 29, 2007, wherein the parties presented evidence and argument pertaining to their positions.

Varian filed the instant motion for summary judgment on November 21, 2007, and Judge Arthur Schwab referred the motion to the Special Master. On December 5, 2007, UPitt filed a brief in opposition to the motion for judgment, along with a motion to join Carnegie Mellon University as a plaintiff, pursuant to Federal Rule of Civil Procedure 19. Varian filed papers in opposition to the motion and, on December 14, 2007, Judge Schwab denied UPitt's motion to join Carnegie Mellon University as a party. (Docket No. 168). Varian then filed a reply memorandum in support its motion for judgment for lack of standing, and we turn now to the contentions of the parties.

Since this civil action was filed, the parties have devoted substantial time and resources to this case. The docket contains over 250 entries. Varian seeks summary judgment with respect to UPitt's complaint with prejudice due to lack of standing because the alleged co-owner of the patents-in-suit, Carnegie Mellon University, (CMU), is an absent but critical party to this litigation. Varian claims that UPitt, if it wishes to pursue a claim for infringement, must file the claim along with its co-owner, CMU. UPitt rejoins that CMU has assigned all substantial rights to any enforcement action by UPitt, and therefore Varian's motion must be denied. After considering the submissions of the parties, we recommend that the District Court grant Varian's motion without prejudice to the University of Pittsburgh filing an amended complaint, in which CMU is added as a party plaintiff. In the alternative, we recommend that the District Court vacate its order dated December 14, 2007, denying UPitt's motion to join, and then deny the instant motion as moot.

| II. | **FACTS** |
|---|---|

Both patents-in-suit name the same five inventors, Joel Greenberger, Andre Kalend, Takeo Kanade, Karun Shimoga, and Charalambos Athanassiou. The were ultimately developed through a joint collaboration (Joint Project) between UPitt and CMU. (Concise Statement, ¶ 3;

2

Responsive Statement, ¶ 3). Two of the inventors, Drs. Kanade and Shimoga, were employees of CMU during the relevant period of the Joint Project. The remaining two inventors, Drs. Greenberger and Kalend, were employed by UPitt during the relevant period. (Concise Statement, ¶ 9; Responsive Statement, ¶ 9).

On or about October 13, 1994, UPitt and CMU jointly adopted "Policy Guidelines – Intellectual Property Rights and Technology Transfer Procedures in Collaborative Projects of the University of Pittsburgh and Carnegie Mellon University," (1994 UPitt/CMU Joint IP Policy), which remained in effect until June 30, 1997. Subsequently, on June 18, 1997, UPitt and CMU jointly adopted "Policy Guidelines – Intellectual Property Rights and Technology Transfer Procedures in Collaborative Projects of the University of Pittsburgh and Carnegie Mellon University" (1997 UPitt/CMU Joint IP Policy), which remained in effect until June 30, 2000. The 1994 and 1997 UPitt/CMU Joint IP Policies (Joint IP Guidelines), which appear to be identical in all material respects, were continuously in effect during all relevant periods, namely, during the performance of the Joint Project, at the time of the filing of the patents-in-suit, and at the time of the issuance of the patents. (Concise Statement, ¶ 20; Responsive Statement, ¶ 20).

UPitt admits that the Joint IP Guidelines, together with an assignment, executed in 1996 by the inventors to UPitt, govern ownership of the patents-in-suit. (Responsive Statement, ¶¶ 20-22). One of the stated objectives of the Joint IP Guidelines was to "facilitate the subsequent commercialization of IP rights." (Motion, Exs. P and Q, Part A.3). The Joint IP Guidelines provide, in relevant part, as follows: "All IP developed jointly by CMU Participants and Pitt Participants during collaboration *shall be owned jointly* by Pitt and CMU and shall be administered in accordance with these Guidelines." (Concise Statement, ¶¶ 15, 18). The Joint IP Guidelines provide that the participants will determine the contributions by the participants to

3

determine allocation of expenses and proceeds between UPitt and CMU. (Motion, Exs. P and Q, Part E).

The Joint IP Guidelines also provide that:

> [t]he "University Allocation" of expenses and proceeds will be proportionate to the sum of the Relative Contributions by the individual Participants from the two universities.
>
> *For example, if two Pitt Participants made at [sic] total of 60% and three CMU Participants 40% of the Relative Contribution toward the invention, then 60% of total distributions will go to Pitt and 40% to CMU, for each university's respective further allocation of proceeds.*

*Id.* (emphasis in original). Furthermore, "[i]n order to clarify and record all details of the resulting allocation of proceeds, a specific Allocation Agreement will be developed . . . . the Allocation Agreement will define the percentage of Net Proceeds to be received by each of the two universities . . . ." *Id.* The Joint IP Guidelines further provide that UPitt and CMU "will share the Net Proceeds from the commercialization" of joint inventions "in proportion to" the Universities' Allocation Agreement. (Motion, Exs. P and Q, Part G). There is evidence that the parties discussed the allocation with respect to the patents at 60% CMU and 40% UPitt, although there is no evidence that these discussions were recorded or memorialized, as contemplated by the Joint IP Policies.

The Joint IP Policies also provide for the designation of one of the two universities' technology transfer offices, as the "Responsible TT Office," which office would facilitate commercialization of IP rights (in this case, the patents-in-suit). Relevant here, the Joint IP Policies provide:

> 2. The Designated TT Office will have the sole responsibility for the commercialization of the IP disclosures resulting from the [collaborative project]. The normal policies and practices used by the Designated TT Office will apply, including the decision process of whether or not the university wishes –
4

> (a) to pursue the commercialization of a particular Disclosure, and in what manner, or
>
> (b) to turn it back to the inventors.
>
> The Designated TT Office will, however, include at least one faculty member of the other university in completing the evaluation process of each Disclosure.
>
> The TT Office which emerges with the responsibility for the commercialization of a Disclosure will be called the "Responsible TT Office."
>
> 3. The Responsible TT Office will work closely with the Participants in planning and executing commercialization of that Disclosure. It will keep the Participants and the other TT Office well informed on its activities and plans, will be sensitive and responsive to any special circumstances (for examples [sic], special regulatory requirements) of the other university, and will consult with the other TT Office on such issues.

*Id.* at Part F. The parties agree that UPitt was designated as the institution responsible for commercializing the patents.

The parties' course of conduct also confirms that UPitt was the lead institution in commercializing the patents. However, the evidence also establishes that UPitt understood CMU's approval was required, as co-owner, to negotiate exclusive licenses and options. For example, when UPitt was negotiating a license with Varian in 2002, UPitt sought approval from CMU as to the licensing terms to be offered. In addition, on or about October 29, 1998, UPitt, CMU, and Elekta Oncology Systems, Inc., entered an agreement in which Pitt and CMU *jointly* granted Elekta an option to negotiate a royalty-bearing, exclusive license to the patents-in-suit.

In 1996, the inventors "assigned" their rights in the patents-in-suit to UPitt pursuant to a boilerplate "Assignment." Likewise, the patents-in-suit-identify UPitt as the "Assignee." (Motions, Exs. B and C, at p. 1). The assignment makes no mention of CMU or the Joint IP Guideline. There is testimony from UPitt's designee, Laura Hillock, that the purpose of the

5

assignment was to facilitate the patent process: "The inventions derived from a collaborative relationship, ownership was with—assignment was to the University of Pittsburgh, which is common to do that up-front for the ease of filing and other things in collaborative relationships." (Motion, Ex. R, p. 47). The parties dispute the legal import of the assignment, with UPitt contending that it had "substantial rights" in the patents-in-suit, and Varian rejoining that it is irrelevant to CMU's joint ownership of the patents.

III.                      <u>**SUMMARY JUDGMENT STANDARD**</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1263 (Fed. Cir. 2007). In deciding whether summary judgment is appropriate, the court must view the evidence in the light most favorable to the non-moving party, with doubts resolved in favor of the non-movant, in this case UPitt. *Israel Bio-Engineering*, 475 F.3d at 1263. Issues of standing may be resolved by way of summary judgment and, where there is no dispute as to the material facts, judgment is appropriate on the issue of standing. *See, e.g., id.*

IV.                       <u>**LEGAL ANALYSIS**</u>

    A.     <u>**Standing to Sue**</u>

The Patent Act of 1952 ("Act") provides that "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. In addition, the Act provides that:

> patents shall have the attributes of personal property . . . .
>
> [P]atents, or any interest therein, shall be assignable in law by an instrument in writing. The . . . patentee . . . may in like manner grant and convey an exclusive right under his . . . patents, to the whole or any unspecified part of the United States.

6

> A certificate of acknowledgement under the hand and official seal
> of a person authorized to administer oaths within the United States
> . . . shall be prima facie evidence of the execution of an
> assignment, grant or conveyance of a patent[.]

35 U.S.C. § 261. Thus, under the Act, a "patentee' includes not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). *See also Israel Bio-Engineering*, 475 F.3d at 1264.

It is a well-settled that a co-owner of a patent must voluntarily join in any action or the case will be dismissed for lack of standing. *See, e.g., Israel Bio-Engineering*, 475 F.3d at 1264 ("[a]bsent the voluntary joinder of all co-owners of a patent, a co-owner acting alone will lack standing."),(citing *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000)); *see also* 8 Donald S. Chisum, *Chisum on Patents* § 21.03[3][d] (LexisNexis 2005)("The traditional rule is that all of the co-owners of a patent must join in bringing a suit for infringement."),(citing cases at n.66). The purpose of the rule is to protect the interests of a defendant in avoiding multiple lawsuits concerning alleged infringement of the same patent. *See, e.g., Willingham v. Lawton*, 555 F.2d 1340, 1344 (6th Cir. 1977). As the Court of Appeals noted,

> Defendants in an infringement suit initiated by a single joint owner
> could have a justifiable fear that should they prevail and the court
> determine that the patent in suit is either invalid or not infringed,
> the remaining joint owners might still relitigate these issues at a
> later date in another costly and vexatious proceeding. Even though
> the remaining joint owners might be bound under traditional rules
> of collateral estoppel or res judicata, and despite the fact that such
> a repetitive suit may be an appropriate case for the awarding of
> attorney fees to defendants[,] defendants still could be prejudiced.

*Id.* at 1345 (footnote 7 omitted). Thus, if CMU is a co-owner of the patents-in-suit, CMU must appear as a party in this infringement action.

UPitt argues that, although CMU is a co-owner of the patent, CMU transferred all substantial rights to UPitt pursuant to the Joint IP Guidelines, and therefore UPitt has the right to

bring this action without CMU as a party, citing *Ortho Pharm. Corp. v. Genetics Inst. Inc.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995); *Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372, 1378 (Fed. Cir. 2000); and *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed. Cir. 1991)). In other words, UPitt as a co-owner and UPitt as the "transferee" of the co-owner, in these two capacities, has standing to sue. We disagree. The record establishes that CMU did not transfer all substantial rights in the patents to UPitt to satisfy the test of standing, and Varian's motion for summary judgment must be granted.

### B. Transfer of Substantial Rights

There is an exception to the standing rule requiring the owner of a patent to be joined in the action. "The exception is that, where the patentee makes an assignment of all substantial rights under the patent, the assignee may be deemed the effective 'patentee' under 35 U.S.C. § 281 and thus may have standing to maintain an infringement suit in its own name." *Prima Tek*, 222 F.3d at 1377 (citing *Vaupel*, 944 F.2d at 875; *Ortho Pharm.*, 52 F.3d at 1030). "To determine whether a[n] . . . agreement has conveyed all substantial rights in a patent, and is thus tantamount to an assignment, we must ascertain the intention of the parties and examine the substance of what was granted." *Id.* at 1378 (citing *Vaupel*, 944 F.2d at 874-75). "In so doing, it is helpful to look at what rights were retained by the grantor." *Id.* Courts "pay particular attention to whether the agreement conveys *in full* the right to exclude others from making, using, and selling the patented invention in the exclusive territory." *Id.* at 1379.

Pursuant to the Joint IP Guidelines, UPitt was designated as the party with the responsibility of commercializing the patents, which is consistent with the stated objective of the Joint IP Guidelines "to facilitate the subsequent commercialization of IP rights." However, the Joint IP Guidelines are devoid of any assignment of CMU's *rights* in the patents. This is a distinction with a difference. A contractual responsibility is a duty which a party assumes

8

pursuant to the contract, which is generally not assignable, whereas a contractual *right* is an interest or benefit which is generally assignable. *See, e.g., Saxe v. Feinstein*, 77 A.2d 419, 421 (Pa. 1951); *Ptashkin ex rel. Fliegelman v. Department of Public Welfare*, 731 A.2d 238, 245 n.9 (Pa. Commw. Ct. 1999). Here, the Joint IP Guidelines, as well as other evidence of record, establishes that UPitt assumed a responsibility, but the evidence does not establish that Carnegie Mellon University assigned or transferred all of its substantial rights to the patents.

"In the absence of a special agreement, each of the co-owners of a patent may make, use or sell the patented invention . . . without the consent of and without accounting to the other owners." 35 U.S.C. § 262; *see also Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 344 (Fed. Cir. 1997)("[e]ach co-owner's ownership rights carry with them the right to license others, a right that also does not require the consent of any other co-owner."); *Willingham*, 555 F.2d at 1344. Indeed, "unless the co-owner has given up these rights through an 'agreement to the contrary,' 35 U.S.C. § 262, the co-owner may not be prohibited from exploiting its rights in the patent[.]" *Schering*, 104 F.3d at 344. Although the Joint IP Guidelines contemplated that the proceeds would be shared with UPitt, there is no evidence that, pursuant to the Joint IP Guidelines or otherwise, CMU gave up its rights to license the patents.

The record establishes that CMU retained the right to license the patents, and that UPitt did not receive an assignment of the right to exclude others from making, using, and selling the patented invention. *Cf. Prima Tek*, 222 F.3d at 1379-80 (Prima Tek did not obtain substantial rights in the patents because it "had no right to exclude others from practicing the patents"); *Schering*, 104 F.3d at 344-47 (co-owner did not relinquish right to license pursuant to an agreement with its co-owner). In addition, there is no evidence in the Joint IP Guidelines, or elsewhere, that CMU relinquished its right to sue for infringement, or the right to use the

patented inventions, both of which are substantial rights. *See, e.g., Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132-33 (Fed. Cir. 1995)(licensee lacked standing where patent owner retained limited right to make, use, and sell products); *Vaupel*, 944 F.2d at 875 (transfer of a right to sue for infringement was "particularly dispositive" of whether plaintiff had substantial rights in the patent so as to confer standing).

Although the *inventors* entered into an assignment with UPitt, *CMU* was not a party to the assignment, and for this reason, CMU's rights were unaffected. In any event, there is evidence that the assignment was done for ease of filing. While the assignment may be indicative that UPitt was the institution responsible for commercializing the patent, the assignment is not evidence that CMU transferred all of its substantial rights to UPitt.

In sum, we find that CMU is a co-owner of the patents and retained substantial rights in the patents-in-suit. CMU is a necessary party to this action. We recommend that the District Court grant the motion for summary judgment without prejudice.

### C.     Additional Recommendations for Proceeding

Although we recommend that the motion for summary judgment be granted, we recommend that it be granted without prejudice to UPitt to file an amended complaint, within thirty days, in which CMU is added as a party plaintiff, which would correct the standing deficiency. The interests of justice and judicial economy weigh in favor of permitting an an amendment to the complaint given the substantial time and resources that the parties have devoted to this case, the apparent willingness of CMU to join in the action, and the fact that CMU is subject to the jurisdiction of the Court. In the alternative, we recommend that the District Court vacate its order dated December 14, 2007, denying UPitt's motion to join.

## V. CONCLUSION

We recommend that the motion of Varian Medical System's Inc. for summary judgment be granted without prejudice to UPitt filing an amended complaint in which CMU is added as a party plaintiff. In the alternative, we recommend that the District Court vacate the order dated December 14, 2007.

March __8__, 2008                    _____
                                     Donald E. Ziegler
                                     Special Master