IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNIVERSITY OF PITTSBURGH | |
| Plaintiff, | |
| v. | Case 2:07-cv-00491-AJS |
| VARIAN MEDICAL SYSTEMS, INC., | Judge Arthur J. Schwab |
| Defendant. | **Filed Electronically** |

**MEMORANDUM IN SUPPORT OF DEFENDANT VARIAN MEDICAL
SYSTEMS, INC.'S MOTION FOR SANCTIONS PURSUANT TO RULE 11
OF THE FEDERAL RULES OF CIVIL PROCEDURE AND/OR 35 U.S.C. § 285**

## I.    INTRODUCTION

Plaintiff University of Pittsburgh ("UPitt") and its counsel, Morgan, Lewis & Bockius LLP ("MLB"), have unreasonably asserted that (1) UPitt owns all rights in the patents-in-suit and (2) Defendant Varian Medical Systems, Inc. ("Varian") infringes those patents. Those allegations, as set forth in UPitt's Complaint and other papers and advocated by UPitt and MLB throughout this litigation, are false and unsupported. As a result, UPitt and MLB have violated Rule 11 by presenting frivolous legal contentions and factual allegations for the improper purposes of delay, obfuscation, and harassment. Such conduct also renders this an "exceptional case" under 35 U.S.C. § 285.

Patent ownership. UPitt alleged in its Complaint that it "is the owner of the entire right, title and interest in and to" U.S. Patent Nos. 5,727,554 and 5,784,431 (the "'554 patent" and the "'431 patent," respectively). That allegation is necessary to establish UPitt's standing to sue. However, it is undeniably false because the patents are co-owned by Carnegie Mellon University ("CMU"). UPitt admitted in a brief that "CMU retains certain rights in the patents-in-suit that arise from the involvement of CMU employees in the research that led to the claimed inventions." UPitt now argues only that it owns all "substantial" rights in the patents. As discussed below, even that argument is frivolous.

CMU's co-ownership of the patents should have been uncovered by UPitt or its counsel during a reasonable pre-suit investigation because the relevant facts have always been in UPitt's possession. UPitt either failed to conduct such an investigation or ignored its results. Consequently, Varian has had to expend a great deal of resources defending itself against a frivolous suit.

Infringement. Because this action may soon be dismissed for lack of standing, this may be Varian's only opportunity to present an independent basis for Rule 11

- 1 -

sanctions: UPitt's lack of a reasonable basis to allege infringement. UPitt did not conduct an adequate pre-suit investigation, and it has never laid out its infringement theories despite its duty to do so pursuant to the Local Patent Rules and in interrogatory responses. Earlier, UPitt argued that it needed Varian's source code before stating its infringement contentions. However, UPitt has now had the source code for months, yet Varian is still being kept in the dark. Varian strongly believes its products do not infringe the patents-in-suit, but it has been put in the position of having to prove a negative because UPitt has not presented Varian with meaningful contentions for Varian to rebut.

For these reasons, Varian respectfully requests that UPitt and/or MLB be sanctioned in the amount of Varian's entire attorney's fees and costs incurred in the course of this litigation, including the present motion. Varian further requests a dismissal order and/or such other relief as the Court deems appropriate.

## II.    NATURE OF THE CASE

Varian is the world leader in the development, manufacture, and sale of equipment for treating cancer using radiation. UPitt alleges that Varian has infringed two patents for radiotherapy technologies. The '431 patent describes a computer program that performs x-ray image matching, in which two images of the same patient taken at different times are compared. The invention supposedly facilitates aiming the radiation beam more accurately during treatment and, when the treatment is finished, verifying that it was done properly. The invention of the '554 patent uses video cameras and a computer program to detect a patient's breathing motion during radiotherapy and control the radiation beam so that it is turned on only during the part of the breathing cycle where the tumor is in the beam's path. *See* Complaint ¶ 6 & Exs. A, B.

- 2 -

## III.   ARGUMENT

### A.   Applicable Standards

#### 1.   Rule 11

Under Fed. R. Civ. P. 11(b), an attorney who presents a pleading, motion, or other paper to the Court certifies that, to the best of his or her knowledge after a reasonable inquiry, (1) the paper is not being presented for any improper purpose, (2) the party's legal contentions are warranted by existing law or a nonfrivolous argument to change existing law, and (3) the factual contentions have evidentiary support "or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." The duties imposed by the various subparts of Rule 11(b) are independent of each other, such that a violation of any one of them justifies sanctions. *CTC Imports and Exports v. Nigerian Petroleum Corp.*, 951 F.2d 573, 578 (3d Cir. 1991). If Rule 11 is violated, the Court has discretion to determine an appropriate sanction. *See, e.g., DiPaolo v. Moran*, 407 F.3d 140, 144-46 (3d Cir. 2005).

To determine whether Rule 11 has been violated, an objective test of "reasonableness under the circumstances" applies. *Napier v. Thirty or More Unidentified Federal Agents*, 855 F.2d 1080, 1090-91 (3d Cir. 1988). Subjective bad faith need not be shown. *Id.*; *see also Martin v. Brown*, 63 F.3d 1252, 1264 (3d Cir. 1995). Moreover, if a reasonable inquiry has not been conducted, the violator will not be shielded from sanctions by "the stroke of luck that the document happened to be justified." *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1279 (3d Cir. 1994); *see also Judin v. United States*, 110 F.3d 780, 785 (Fed. Cir. 1997) ("Rule 11 is not about after-the-fact investigation").

Among other things, Rule 11(b) prohibits "later advocating" a pleading, motion, or other paper that violates the standards set forth in the rule. *See* Fed. R. Civ. P. 11(b).

- 3 -

"[A] litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." Advisory Committee Note to the 1993 amendment to Rule 11, reprinted at 146 F.R.D. 401, 585. Thus, "if evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention." *Id.* at 585-86.

Rule 11 sanctions may be awarded even where the court lacks subject matter jurisdiction. *E.g. Willy v. Coastal Corp.*, 503 U.S. 131, 112 S. Ct. 1076, 117 L. Ed. 2d 280 (1992). Rule 11 sanctions have been awarded against plaintiffs who lacked standing or where there were other plain jurisdictional defects. *See, e.g., Davis v. AVCO Finance*, 158 B.R. 1000 (Bankr. N.D. Ind. 1993) (standing); *International Shipping Co. v. Hydra Offshore, Inc.*, 875 F.2d 388 (2d Cir. 1989) (diversity jurisdiction).

### 2.    35 U.S.C. § 285

"The court in exceptional [patent] cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. An award of fees is in the trial court's discretion. *Delta-X Corp. v. Baker Hughes Prod. Tools, Inc.*, 984 F.2d 410, 414 (Fed. Cir. 1993). "Bad faith litigation" and "baseless suits" are grounds for an award against the plaintiff. *Cambridge Prods., Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050-51 (Fed. Cir. 1992); *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579 (Fed. Cir. 1993). The court may base an award on evidence of either "actual wrongful intent" or "gross negligence." *Machinery Corp. of Am. v. Gullfiber AB*, 774 F.2d 467, 473 (Fed. Cir. 1985).

- 4 -

**B.      UPitt and MLB Violated Rule 11 and Section 285 by Unreasonably Alleging That UPitt Owned All Rights in the Patents-In-Suit**

**1.      Nature and Relevance of UPitt's Ownership Allegation**

In its Complaint, UPitt falsely alleged that it "is the owner of the *entire* right, title and interest in and to United States Patent No. 5,727,554 ("the '554 patent"), and United States Patent No. 5,784,431 ("the '431 patent") . . . ." Complaint ¶ 5 (emphasis added). This allegation is of central importance to the issue of standing, because a co-owner of a jointly owned patent lacks standing to sue for patent infringement by itself. *International Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1331 (Fed. Cir. 2001); *Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1264-65 (Fed. Cir. 2007).

**2.      The Patents-in-Suit Are Jointly Owned by UPitt and CMU**

Contrary to the Complaint, UPitt does not own all rights in the patents-in-suit. The inventions were developed as part of a joint research project between two UPitt professors, two CMU professors, and a CMU student.  Concise Statement ¶¶ 3, 9-11.[1] UPitt admits that ownership rights in the patents are therefore governed by Joint IP Policy Guidelines adopted by UPitt and CMU in 1994 and renewed in 1997. *See id.* ¶¶ 14-20; Exhibits A, B;[2] UPitt SJ Opp. [Docket No. 159] at 2.  The guidelines state that "[a]ll [intellectual property] developed jointly by CMU Participants and Pitt Participants during collaboration **shall be owned jointly by Pitt and CMU** . . . ." Exhibit A, § D.4; Exhibit B, § D.4 (emphasis added).  After the patents issued, UPitt and CMU repeatedly treated

---

[1] "Concise Statement" refers to the Concise Statement of Material Facts that Varian filed in support of its Motion for Summary Judgment for Lack of Standing.  To avoid unnecessary repetition, Varian incorporates by reference herein its summary judgment papers, Docket Nos. 127-130.

[2] All exhibits referred to in this brief are attached to the Declaration of Matthew H. Poppe, filed herewith.

CMU as a co-owner of the patents in connection with licensing discussions. Concise

Statement ¶¶ 23-25. CMU currently believes it is a co-owner of the patents. *Id.* ¶ 26.

### 3. During This Litigation, UPitt Attempted to Conceal CMU's Joint Ownership of the Patents-in-Suit

As noted above, UPitt hid CMU's co-ownership of the patents-in-suit by falsely

alleging in the Complaint that it owned <u>*all*</u> rights in the patents. *See* Complaint ¶ 5.

UPitt has never withdrawn or amended that allegation.

UPitt again concealed CMU's rights when it responded to Varian's Interrogatory

No. 1, which asked about ownership of the patents. The interrogatory reads:

> State all facts and identify all documents, communications, and
> things concerning any actual or contemplated transfer of ownership
> or transfer or license of rights relating to any Patents-In-Suit,
> including any actual or contemplated contracts, transfer
> agreements, option agreements, licenses or assignments, or any
> communications relating to the same, between Plaintiff [UPitt] and
> any third party.

Exhibit C, pp. 4-5. In both its original and supplemental responses to this interrogatory,

UPitt stated under oath that "there has been no actual transfer of ownership or transfer or

license of rights relating to any patents-in-suit." Exhibit D, pp. 2-3; Exhibit E, p. 4. This

statement was false, because the UPitt/CMU Joint IP Policy Guidelines transferred

certain patent rights between UPitt and CMU. *See* Exhibits A, B. UPitt admitted this in a

recent brief, stating that "the application of the Joint IP Guidelines transferred to UPitt

broad rights to commercialize the Patents-In-Suit . . . ." UPitt SJ Opp. at 10; *see also id.*

at 4 (stating that the policies and related decisions by UPitt and CMU "had the effect of

granting all substantial rights in the Patents-In-Suit to UPitt."). Yet UPitt did not disclose

CMU, the Guidelines, or any related communications in its interrogatory response.

OHS West:260358483.5

### 4.   Recently, UPitt Admitted That CMU Has Rights in the Patents

In two recently-filed briefs, UPitt admitted that CMU possesses rights in the patents-in-suit. *See* UPitt SJ Opp. [Docket No. 159] at 2, 5, 9; UPitt Motion to Join CMU [Docket No. 149] at 1 ("CMU retains certain rights in the patents-in-suit that arise from the involvement of CMU employees in the research that led to the claimed inventions.").

### 5.   UPitt's False Assertion of Ownership Violated Rule 11

UPitt's false allegations of complete patent ownership in the Complaint and in UPitt's interrogatory responses are sanctionable.  UPitt has no excuse for failing to be forthright.  The evidence shows that UPitt *knew* it was a mere co-owner of the patents-in-suit, yet it filed this case by itself anyway and misrepresented its true ownership status. In addition, as the relevant facts were in UPitt's possession prior to filing suit, they should have been discovered by MLB as part of a reasonable pre-filing investigation.

Varian was able to discover the key facts related to CMU's co-ownership of the patents directly from UPitt witnesses.  For example, Dr. Joel Greenberger, one of the inventors and a current UPitt employee, knew that the patents resulted from collaboration between UPitt and CMU and that there was a joint research agreement between the two universities. *See* Exhibit F, pp. 40:11-13, 41:8-25, 62:6-64:14, 71:5-20.  Two other UPitt employees, Marc Malandro and Laura Hillock (one of the attorneys in charge of supervising this case), were also able to give testimony about those facts.  *See* Exhibit G, pp. 7:12-8:3, 59:8-60:6, 61:14-62:3, 93:10-94:21, 121:20-122:20; Exhibit H, pp. 8:23-10:15, 14:3-19:5, 36:14-40:1, 46:5-48:16.  This shows UPitt knew the relevant facts and MLB should have discovered them. *See Wigod v. Chicago Mercantile Exch.*, 981 F.2d 1510, 1523 (7th Cir. 1992) (attorney should interview available witnesses before suing).

OHS West:260358483.5

Similarly, many of the documents that show CMU's co-ownership of the patents-in-suit were in UPitt's possession prior to suit, as shown by the fact that UPitt produced them in this action. *See* Poppe SJ Decl. [Docket No. 130], ¶¶ 3-4, 12-13, 17, 23-25 & Exs. B, C, K, L, P, V, W, X.[3] These include the Joint Policy Guidelines that establish CMU's joint ownership, as well as an agreement with a third party in which UPitt and CMU jointly granted an option to license the patents-in-suit. *See id.*, Exs. P, X. Other relevant documents were produced by CMU or its employee, inventor Dr. Takeo Kanade, and therefore were accessible to UPitt through its collaborative relationship with CMU in connection with this litigation. *See id.*, ¶¶ 8, 14, 18, 20, 26-34 & Exs. G, M, Q, S, Y-GG; *see also* Exhibit H, pp. 40:20-42:8, 46:5-53:4; UPitt Motion to Join CMU [Docket No. 149]. Those documents include extensive correspondence between UPitt and CMU related to the patents-in-suit, including an email from an attorney who worked for UPitt stating that UPitt needed CMU approval to have "negotiating authority" in licensing discussions with Varian. *See* Poppe SJ Decl., Exs. G, M, S, Y-FF. UPitt should have reviewed those documents before filing a Complaint asserting that it owned "the entire right, title and interest in and to" the patents-in-suit. *See Insurance Benefit Administrators, Inc. v. Martin*, 871 F.2d 1354, 1357 (7th Cir. 1989) (to comply with Rule 11, all available relevant documents should be examined prior to filing a case).

As UPitt's false ownership allegations were the result of intentional misdirection (or in MLB's case, perhaps inadequate investigation), they violated Rule 11 and also render this an "exceptional case" under 35 U.S.C. § 285. *See, e.g.,* Fed. R. Civ. P. 11(b)(3); *Peerless Indus. Paint Coatings Co. v. Canam Steel Corp.*, 979 F.2d 685, 687

---

[3] The document marked as Exhibit P to the Poppe SJ Decl., though marked with CMU Bates numbers, was also produced by UPitt in this action.

OHS West:260358483.5

(8th Cir. 1992) (sanctions for misstating facts); *Caroll v. Acme-Cleveland Corp.*, 955 F.2d 1107, 1116 n.4 (7th Cir. 1992) (same) ; *Belmont Community Hosp. v. Quong Yick Co. ERISA Plan*, 1991 U.S. Dist. LEXIS 16796, at *3-*6 (N.D. Ill. Nov. 8, 1991) (sanctions due to no evidentiary support for element of claim); *Van Berkel v. Fox Farm & Rd. Mach.*, 581 F. Supp. 1248, 1249-50 (D. Minn. 1984) (same); *In re Ronco, Inc.*, 838 F.2d 212, 218 (7th Cir. 1988) (sanctions for omitting "highly relevant facts"); *Warshay v. Guinness PLC*, 750 F. Supp. 628, 639 (S.D.N.Y. 1990) (sanctions for misleading assertions and omitted facts).

> **6.     When UPitt's False Ownership Allegations Were Brought to Light, UPitt Asserted Frivolous Standing Arguments**

In opposing Varian's summary judgment motion for lack of standing, UPitt sought to avoid the consequences of its admissions and the other evidence of CMU's co-ownership of the patents-in-suit by relying on frivolous legal and factual arguments. Specifically, UPitt argued that it owned "all substantial rights" in the patents despite CMU's admitted retention of certain rights. *See* UPitt SJ Opp. [Docket No. 159], *passim.*

One right that UPitt concedes is substantial is the right to license a patent to others. *See id.* at 9 (citing *Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372, 1378 (Fed Cir. 2000)). UPitt argued that it alone can license the patents-in-suit to others, *see id.* at 5-9, but that argument was frivolous. It was based entirely on a contract provision stating that UPitt had the "sole responsibility"—not the sole right—to "commercialize" the patents. *See id.* at 5. UPitt offered no explanation why a provision addressing UPitt's "responsibility" would strip CMU of its statutory right to license a jointly-owned patent. *See Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 344 (Fed. Cir. 1997) ("Each co-owner's ownership rights carry with them the right to license others. . . ."). UPitt also ignored

evidence that the parties had treated CMU as having licensing rights over the patents-in-suit, including a UPitt email stating that it lacked "negotiating authority" for a patent license without prior approval from CMU. *See* Concise Statement ¶¶ 24-25; Exhibit I.

Another right that is considered "substantial" for standing purposes is the right to make, use, and sell the patented invention(s). *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132-33 (Fed. Cir. 1995). A joint owner generally retains these rights absent a contrary agreement. 35 U.S.C. § 262. UPitt did not argue that CMU had relinquished these rights. UPitt merely stated, conclusorily, that ████████████████████████ ████████████████████████. *See* UPitt SJ Opp. [Docket No. 159] at 9. That statement was made without citation to evidence or authority or supporting argument.

Because UPitt's standing argument ignored controlling authority and relied upon a selective and misleading presentation of evidence, it was frivolous and in violation of Rule 11 and 35 U.S.C. § 285. *See, e.g., Zuk v. Eastern Pa. Psychiatric Inst. of the Medical College of Pa.*, 103 F.3d 294, 299-300 (3d Cir. 1996) (affirming award of sanctions where party's brief showed failure to research law properly); *In re Ronco, Inc.*, 838 F.2d at 218 (sanctioning appellant for omitting "highly relevant facts"); *Warshay*, 750 F. Supp. at 639 (sanctioning party for making misleading assertions and omitting facts); *Fransen v. Terps, L.L.C.*, 153 F.R.D. 655, 660 (D. Colo. 1994) ("Lacking any authority directly supporting his position, [a party] must at least articulate some rational basis" for his position to avoid sanctions).

## C.   The Issue of Infringement

UPitt alleges that "Varian has infringed and continues to infringe the Patents-In-Suit . . . ." Complaint ¶ 6. This allegation is legally and factually unsupported.

- 10 -

### 1.     UPitt and MLB Did Not Adequately Investigate Infringement Prior to Filing Suit

"Performing a pre-filing assessment of the basis of each infringement claim is . . . extremely important." *View Eng'g v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000) (affirming district court's award of Rule 11 sanctions). This is because "[a] patent suit can be an expensive proposition" and "[d]efending against baseless claims of infringement subjects the alleged infringer to undue costs—precisely the scenario Rule 11 contemplates." *Id.* A patent plaintiff's failure to demonstrate that, prior to filing suit, it had a reasonable basis to believe it could prove infringement "should ordinarily result in the district court expressing its broad discretion in favor of Rule 11 sanctions, at least in the absence of a sound excuse or considerable mitigating circumstances." *Id.*

Rule 11 requires that plaintiff's counsel interpret the pertinent patent claims, compare them to each accused device, and reach a reasonable conclusion of infringement before filing a patent suit. *Antonious v. Spalding & Evenflo Cos.*, 275 F.3d 1066, 1072-74 (Fed. Cir. 2002). A reasonable investigation ordinarily requires examining the accused device. *Judin v. United States*, 110 F.3d 780, 784-85 (Fed. Cir. 1997) (reversing denial of Rule 11 motion); *View Eng'g*, 208 F.3d at 985 (affirming Rule 11 sanctions). "[R]everse engineering or its equivalent is required." *Network Caching Technology, LLC v. Novell, Inc.*, 2002 WL 32126128, at *5 (N.D. Cal. 2002). If necessary, the plaintiff and its counsel should contact the defendant and/or third parties to try to obtain sample products and/or inquire about their operation. *See Judin*, 110 F.3d at 781, 784.[4]

---

[4] In Federal Circuit cases that deny Rule 11 sanctions, the plaintiff had acquired a sample of the accused product and made other efforts to obtain infringement information. *See Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1302 (Fed. Cir. 2004); *Hoffmann-La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359, 1363-65 (Fed. Cir. 2000); *Cambridge Prods., Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050 (Fed. Cir. 1992).

UPitt refused to disclose the details of its pre-lawsuit infringement investigation on grounds of privilege.   *See* Exhibit H, pp. 36:14-40:1, 60:5-94:17.   The limited information UPitt provided indicates that its pre-lawsuit investigation consisted solely of reviewing unspecified, publicly-available written information about Varian products.   *See id.* at 60:21-61:10. ████████████████████████████████████████████

████████████████████████████████████████████████. *See id.* at 62:21-64:22. ███████████████████████████████████████████████

████████████████████████████████████████. *See id.* at 66:10-73:23, 75:1-11, 81:9-82:9, 94:11-17. ███████████████████████████████████

████████████████████████████. *Id.* at 88:20-89:21.

UPitt could have obtained direct access to the accused Clinac®, Trilogy™, PortalVision™, On-Board Imager®, and/or RPM Respiratory Gating systems by simply contacting its sister institution, UPMC, which owns those devices.   *See* Exhibit J; Exhibit AA, pp. 37:4-40:2. ███████████████████████████████████████

██████████████████. *See* Exhibit H, pp. 66:10-73:23, 88:20-90:4; Exhibit K.   An internal email produced by a UPMC employee pursuant to subpoena indicates that UPMC was responsive to UPitt's request.   *See* Exhibit K.   However, ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ Exhibit H, pp. 69:20-70:18.   Thus, despite the relative ease with which UPitt could have examined the accused products, it failed to do so.   The considerable benefit that could have been obtained by such an examination—learning prior to filing that there was no good faith basis to allege infringement—is precisely the reason that Rule 11 exists and compels sanctions here.

>    **2.    UPitt Has Never Disclosed Its Infringement Contentions to
>           Varian, Presumably to Hide the Weakness of Its Case**

UPitt's failure to conduct an adequate pre-filing investigation of infringement is not a mere technicality.  Even now, after completion of discovery, UPitt's infringement case lacks any merit whatsoever.  This is shown by UPitt's repeated refusal to state its infringement contentions in anything but the vaguest, most general terms.  *See, e.g., McLaurin v. Werner*, 909 F. Supp. 447, 456 (S.D. Miss. 1995) (awarding Rule 11 sanctions where plaintiff's "stalling approach to the prosecution of the [] suit show[s] that his complaint lacked good faith underpinnings from the start").

The Complaint states a bare allegation of infringement by Varian.  It provides no details regarding the alleged infringement.  *See* Complaint ¶ 6.

On June 15, 2007, UPitt served infringement contentions pursuant to LPR 3.2. Exhibit L.  Varian moved to compel further infringement contentions, arguing that they were so vague as to violate LPR 3.2.[5]  Docket Nos. 34-39.  In its successful opposition, UPitt blamed the lack of detail in its infringement contentions on its lack of access to Varian source code and technical documents.  *See* Docket No. 40.  However, the cases cited by UPitt held that a plaintiff should supplement its contentions after receiving the defendant's technical information.  *See id.* at 4-7.  Also, UPitt told the Court it had promised Varian "that it will supplement its Disclosure once it has been provided access

---

[5] In its motion, Varian pointed out that UPitt's infringement contentions do nothing more than parrot back the language of the patent claims.  For example, one element of claim 21 of the '431 patent is a "tracking means tracking movement between successive sets of DPIS."  *See* '431 patent (attached as Exhibit B to the Complaint), col. 11, lines 4-5. UPitt's corresponding infringement contention reads, "As currently understood, the On-Board Imager of the Clinac and Trilogy systems use successive images to track movements between successive sets of digital portal image signals." Exhibit L, p. 5. This statement does not identify the structure(s) within the accused products that correspond to the claim language; rather, it is a bare accusation of infringement.

- 13 -

to, and analyzed, Varian's source code...."  *Id.* at 11.  Varian produced its source code and technical documents months ago, but UPitt still has not supplemented its contentions. Poppe Rule 11 Decl. ¶¶ 13, 29-30.[6]

In an effort to obtain more information about UPitt's infringement position, Varian served UPitt with interrogatories on September 5, 2007.  *See* Exhibit M.  Among other things, Varian asked UPitt to "state all facts and identify all evidence that you believe support your contention" that Varian infringes any claim of the patents-in-suit. *Id.* at 4.  UPitt's response was due on the last day of discovery, after UPitt had received all information it might need to provide a complete answer.  Nevertheless, UPitt's response merely listed objections and referred Varian to its infringement contentions, which as noted above are vague and deficient.  *See* Exhibit N, p. 4.  UPitt provided the same response to Varian's other infringement-related contention interrogatories.  *See id.* at 5-11.  During recent meet-and-confer discussions, UPitt refused to supplement its responses until after expert discovery, if at all.  *See* Exhibit O, pp. 7-8; Exhibit P, p. 6.

### 3.   UPitt Lacks a Good Faith Basis to Allege Infringement

Varian believes that UPitt lacks a good faith basis to allege infringement.  UPitt's refusal to provide detailed infringement contentions is evidence of that fact.  However, that same refusal makes it impossible for Varian to demonstrate non-infringement conclusively because Varian does not know what UPitt's infringement arguments are and therefore cannot attempt to rebut them.  Varian would have to prove a negative.  Yet if this case is dismissed for lack of standing, Varian may have no other opportunity to seek sanctions for UPitt's unreasonable infringement allegations.  Accordingly, UPitt should

---

[6] "Poppe Rule 11 Decl." refers to the Declaration of Matthew H. Poppe in Support of Defendant Varian Medical Systems, Inc.'s Motion for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure, filed herewith.

be held fully accountable for alleging infringement without first conducting an adequate pre-filing investigation and without ever providing Varian with detailed infringement contentions as required by Rule 33 and the Local Patent Rules.

Although Varian cannot present a comprehensive non-infringement argument here for the reasons discussed above, two examples will show why Varian reasonably believes that UPitt's infringement position is frivolous.

Claim 26 of the '431 patent requires a "processing means" that automatically matches (*i.e.*, aligns) two digital x-ray images "without input of any physical dimensions of any features within said images . . . ." '431 patent (Exhibit B to the Complaint), col. 12, lines 5-8. UPitt concedes that the "matching" of claim 26 must occur "automatically by the use of x-ray opaque fiducials."[7] Docket No. 102, p. 34. According to the '431 patent, the fiducials are placed on a patient before x-rays are taken. *See* Complaint, Ex. B, col. 5, lines 41-43. They can then be detected in the x-ray images. *See id.*, col. 7, lines 38-49. Varian's accused On-Board Imager® device has a function in which x-ray opaque fiducials are used for x-ray image alignment. *See* Exhibit Q, pp. VAR00002975 to VAR00002985. However, that function requires inputting the physical dimensions of the fiducials. *See id.* at VAR00002978; Exhibit R, pp. 138:15-24. Consequently, it does not operate "without input of any physical dimensions of any features within said images," as required by claim 26. UPitt has no non-frivolous argument to the contrary.

Claim 21 of the '431 patent requires a "tracking means tracking movement between successive sets of digital portal image signals." *See* Complaint, Ex. B, col. 11, lines 4-5. "Tracking" refers to identifying movement *as it occurs* so that the radiation

---

[7] In this context, x-ray opaque fiducials are objects that are made of a material that causes them to show up in x-ray images. They are used as reference points in the images.

therapy equipment can be adjusted in response to that movement. *See id.*, col. 4, lines 49-52 ("The invention can be used to detect patient movement *during treatment* to terminate generation of the x-ray beam . . . or to maneuver the equipment to maintain proper alignment"; emphasis added); *see also id.*, col. 2, lines 36-42; col. 3, lines 30-36; col. 3, line 67 - col. 4, line 3; col. 6, lines 60-64; col. 7, lines 3-5; col. 9, lines 11-21; Figs. 3, 11.  Varian's accused On-Board Imager® device does not infringe claim 21 because it does not "track movement." Indeed, as it cannot be used *at all* while the treatment beam is on, it obviously cannot be used to "track movement" during treatment to control the radiation therapy equipment. *See* Exhibit R, pp. 45:12-46:3, 59:15-60:10. Also, the On-Board Imager® can match only two x-ray images or image pairs at a time in a static, non-real-time manner. *See* Exhibit Q, pp. VAR00002959-VAR00002996, VAR00003040-VAR00003041; Exhibit R, pp. 58:19-59:13, 71:25-74:23, 86:15-88:1, 108:5-109:13, 118:13-122:1. It cannot match successive x-ray images to track movement, as required by claim 21. *Id.* Again, UPitt has no non-frivolous argument to the contrary.

### D.     The Court Should Sanction UPitt and/or MLB in a Manner That Will Deter Future Misconduct and Compensate Varian for Its Losses

District Courts have broad discretion in determining both the type and amount of Rule 11 sanctions.  "[T]he sanction may consist of, . . . if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation."[8] Fed. R. Civ. P. 11(c)(2); *see also, e.g., Napier v. Thirty or More Unidentified Federal Agents*, 855 F.2d 1080, 1091 (3d Cir. 1988) ("Rule 11 specifically authorizes as

---

[8] For violations of Rule 11(b)(1) and (b)(3), a party or its counsel may be sanctioned. *See* Fed. R. Civ. P. 11(c). For Rule 11(b)(2), only counsel may be sanctioned. Fed. R. Civ. P. 11(c)(2)(A). The Court may sanction a firm rather than individual attorneys. *See* Fed. R. Civ. P. 11(c); *MHC Investment Co. v. Racom Corp.*, 323 F.3d 620 (8th Cir. 2003).

one available sanction an award equivalent to the movant's legal fees."); *DiPaolo v. Moran*, 407 F.3d 140, 145 (3d Cir. 2005) (fee shifting is approved method for achieving goals of Rule 11); *Divane v. Krull Elec. Co.*, 319 F.3d 307, 314 (7th Cir. 2003) (to serve Rule 11's deterrent purpose, courts "more commonly . . . may direct the offending party to pay the other party's reasonable attorney's fees."); Fed. R. Civ. P. 11(c)(1)(A) (authorizing award of fees to prevailing party on Rule 11 motion).   As noted, reasonable attorney's fees may also be awarded pursuant to 35 U.S.C. § 285.

An appropriate sanction in this case would be to award Varian its entire fees and costs, or a portion thereof deemed proper by the Court.   Fees and costs may be awarded under Rule 11 to the extent they were "incurred as a direct result of the violation."   Fed. R. Civ. P. 11(c).   Here, all of Varian's fees and costs resulted from the violations of UPitt and its counsel, MLB.   UPitt's false allegations regarding patent ownership were a necessary predicate for UPitt's standing to sue.   Because UPitt lacks standing, this case should never have been filed.   UPitt's false statements and withholding of material facts compounded the problem by delaying resolution of the standing issue by many months. Thus, UPitt's false allegations have been a direct cause of all of Varian's fees and costs. Likewise, this entire case relates to the allegation that Varian is infringing the patents-in-suit.   UPitt and MLB violated Rule 11 by making that allegation without an adequate pre-filing investigation, and by continuing to advocate it without a reasonable factual or legal basis.   All of Varian's fees and costs relate to its defense against that infringement allegation; thus, they were all "incurred as a direct result of the violation."

An award of Varian's fees and costs also would meet the requirement that the sanction be "warranted for effective deterrence."   Fed. R. Civ. P. 11(c).   UPitt has

demanded that Varian state a willingness to pay over one million dollars before UPitt will even agree to *discuss* settling this case, and UPitt undoubtedly will ask for an award of tens of millions of dollars in damages if this case goes to a jury.  UPitt clearly perceives that it has an enormous amount to gain from this litigation.  Similarly, MLB presumably expected to earn hundreds of thousands if not millions of dollars in fees, particularly if it won or obtained a substantial settlement.  An award of anything less than the full amount of Varian's fees and costs is unlikely to deter future violations when such large amounts are at stake.  Moreover, UPitt and its counsel are both likely to engage in future patent litigation.  ██████████████████████████████ ████████████████████████████████████████ Poppe Rule 11 Decl. ¶ 31.  UPitt earns millions of dollars per year in licensing fees.  *See* Exhibit S. UPitt will undoubtedly encounter future licensing targets who resist being bullied into licenses, resulting in more patent lawsuits by UPitt.  Likewise, UPitt's counsel has a substantial patent practice and will be involved in many more patent suits in the future. *See* Exhibits T, U.  Thus, anything other than a substantial monetary sanction is unlikely to have a meaningful deterrent effect.

Several other factors also support an award of fees and costs against UPitt and MLB.  For example, the violator's ability to pay is a key factor in determining whether and in what amount to award monetary sanctions.  *Zuk v. Eastern Pa. Psychiatric Inst. of the Medical College of Pa.*, 103 F.3d 294, 301 (3d Cir. 1996).  Here, UPitt is a major university and MLB is a global law firm, each of which clearly has the financial resources to pay a substantial monetary penalty.  As noted above, for example, UPitt earns millions of dollars a year in patent royalties alone.  *See supra* at 18.

OHS West:260358483.5

Another factor in determining an appropriate sanction is the amount of time that the plaintiff and its counsel had to investigate the facts and law prior to committing a Rule 11 violation. *CTC Imports and Exports v. Nigerian Petroleum Corp.*, 951 F.2d 573, 578 (3d Cir. 1991). Here, UPitt had years to investigate the issues of ownership and infringement prior to suing Varian. Discussions between UPitt and Varian concerning the patents-in-suit commenced in 2002 and resumed in 2005. *See* Exhibits V, W. ███

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ *See* Exhibit H, pp. 16:2-18:16. This lawsuit was not ████████████████████ in April 2007. Since then, UPitt and its counsel have had another nine months, plus the benefit of discovery, to investigate those issues and voluntarily abandon the Complaint. Instead, however, Varian has been forced to engage in protracted litigation in order to achieve the dismissal of this lawsuit.

Also relevant in determining Rule 11 sanctions are the violators' state of mind and level of experience. *Lieb v. Topstone Indus.*, 788 F.2d 151, 157-58 (3d Cir. 1986). "Although a subjective test penalty is not used in deciding initially whether sanctions should be imposed, it may be relevant in determining the form and amount of punishment or compensation." *Id.* at 157. This includes "the state of the attorney's or party's actual or presumed knowledge when the pleading or other paper was signed." *Id.* at 158. Also, "the conduct of an experienced lawyer or of a lawyer who acted in bad faith is more apt to invite assessment of a substantial penalty than that of a less experienced or merely negligent one." *Id.* These factors support a substantial monetary sanction against UPitt and/or MLB. As noted above, each of them is very experienced in patent matters. *See*

- 19 -

*supra*, p. 18. In addition, the facts support the conclusion that the Rule 11 violations here were not merely negligent but instead were done with knowledge and in bad faith.

This motion could not reasonably have been presented earlier; certainly not so as to bring about a ruling prior to the close of discovery and the claim construction hearing. Because UPitt was not forthright about patent ownership, Varian could not be sure that UPitt lacked standing until it obtained all relevant documents and deposed UPitt's and CMU's 30(b)(6) witnesses. Only then was Varian was able to determine conclusively that the patent rights were governed by the Joint IP Policy Guidelines, under which the patents are "owned jointly" by UPitt and CMU. *See supra*, pp. 5-9. The last 30(b)(6) deposition did not take place until October 22, 2007, in response to a court order. Poppe Rule 11 Decl. ¶ 32; Docket No. 83. Also, one of the key documents on which Varian relied to establish UPitt's lack of standing was not produced by UPitt until October 19, 2007, after discovery closed. Poppe Rule 11 Decl. ¶ 33. With respect to infringement, Varian notified UPitt of its Rule 11 violations by letter on August 7, 2007, and September 4, 2007. *See* Exhibits X, Y. UPitt denied violating Rule 11. *See* Exhibit Z. Varian did not believe it should file a Rule 11 motion on this issue until it had seen UPitt's detailed infringement contentions. UPitt did not make it clear until after the close of discovery that it would refuse to provide its contentions to Varian. *See supra*, p. 14.

If the Court grants Varian's motion, Varian requests leave to submit details regarding its reasonable fees and expenses incurred in this action at that time in accordance with a schedule to be set by the Court.

Another appropriate sanction would be an order dismissing this infringement action with prejudice. *See Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir. 1987)

(dismissal is available sanction under Rule 11); *Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 111 S. Ct. 922 (1991) (affirming dismissal order under Rule 11).   Although the *Gaiardo* court expressed reluctance to dismiss a client's case under Rule 11 "because of the lawyer's indiscretion," that concern does not apply to a case such as this where the client is equally at fault for the violations.

## IV.    CONCLUSION

For the reasons stated above, Varian respectfully requests that the Court grant its motion for Rule 11 sanctions and/or reasonable attorney fees pursuant to 35 U.S.C. § 285.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:  /s/  Matthew H. Poppe
William L. Anthony, Jr. (admitted *pro hac vice*) (CA 106908)
Matthew H. Poppe (admitted *pro hac vice*) (CA 177854)
Zheng (Jen) Liu (admitted *pro hac vice*) (CA 229311)
1000 Marsh Road
Menlo Park, CA  94025
(650) 614-7400
(650) 614-7401 (fax)
wanthony@orrick.com
mpoppe@orrick.com
jenliu@orrick.com

PICADIO SNEATH MILLER & NORTON, P.C.

Henry M. Sneath, Esquire
hsneath@psmn.com
Pa. I.D. No. 40559
Shannon M. Clougherty, Esquire
sclougherty@psmn.com
Pa. I.D. No. 88586
600 Grant Street, Suite 4710
Pittsburgh, PA 15219
(412) 288-4000 [T]
(412) 288-2405 [F]

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the **MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE AND/OR 35 U.S.C. § 285** was served upon the University of Pittsburgh and Morgan Lewis & Bockius LLP either individually or through counsel via:

|   |   |
|---|---|
| ___X___ | Hand-Delivery |
| _____ | Facsimile |
| _____ | First Class, US Mail, Postage Prepaid |
| _____ | Certified Mail-Return Receipt Requested |
| _____ | ECF Electronic Service |
| _____ | Overnight Delivery |

at the following addresses:

Rita E. Tautkus
Morgan Lewis & Bockius, LLP
One Market – Spear Street Tower
San Francisco, CA  94105
rtautkus@morganlewis.com

Dated:  January 16, 2008                    _____

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the **MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE AND/OR 35 U.S.C. § 285** was served upon the University of Pittsburgh and Morgan Lewis & Bockius LLP either individually or through counsel via:

|            |                                        |
|------------|----------------------------------------|
| _____ | Hand-Delivery                          |
| _____ | Facsimile                              |
| _____ | First Class, US Mail, Postage Prepaid  |
| _____ | Certified Mail-Return Receipt Requested |
| ____X____  | ECF Electronic Service                 |
| _____ | Overnight Delivery                     |

at the following addresses:

Rita E. Tautkus
Morgan Lewis & Bockius, LLP
One Market – Spear Street Tower
San Francisco, CA  94105
rtautkus@morganlewis.com

Dated:  March 20, 2008              */s/ Matthew H. Poppe*_____
                                    Matthew H. Poppe