IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNIVERSITY OF PITTSBURGH | ) | ELECTRONICALLY FILED |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  2:07-CV-00491-AJS |
| | ) | |
| VARIAN MEDICAL SYSTEMS, INC. | ) | Judge Arthur J. Schwab |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF UNIVERSITY OF PITTSBURGH'S OPPOSITION TO DEFENDANT VARIAN MEDICAL SYSTEMS, INC.'S MOTION FOR SANCTIONS PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE AND/OR 35 U.S.C. § 285**

I.      **INTRODUCTION.**

How many different ways can Varian make the same argument? That answer may never be found. But, one more tick can be added to the count as Varian's motion for sanctions is nothing more than a regurgitation of the same arguments raised in numerous papers. Varian's latest recycled effort, however, is a new low, without basis in fact or law, and should be denied. Moreover, Varian's vexatious attempts to harass UPitt and increase the cost of litigation should no longer be tolerated.

After sifting through repetitive, and unsupported statements, Varian's motion raises two issues: (1) whether UPitt has the right to sue for patent infringement, and (2) whether UPitt's attorneys had an objectively reasonable basis to believe that Varian infringed. The evidence shows that UPitt is the legal title holder of the patents-in-suit. Thus, UPitt has standing to sue. The evidence also shows that UPitt's attorneys investigated Varian's public admissions and reached the objectively reasonable conclusion that Varian infringed. As UPitt told Varian each time it threatened sanctions, Varian's claims are baseless, and are themselves sanctionable. UPitt warned Varian each time that it would seek sanctions. Thus, Varian's motion should be denied and UPitt awarded fees and costs for responding to Varian's systematic harassment.

II.     **AS THE SOLE LEGAL TITLE HOLDER TO THE PATENTS-IN-SUIT, UPITT IS THE PARTY WITH STANDING TO SUE FOR INFRINGEMENT.**

Every single inventor to the patents-in-suit assigned their "entire right, title and interest for all countries in and to any and all inventions which are disclosed or claimed . . . ." *See* Varian's MSJ, Exhs. K-L (Assignments). With complete legal title, those assignments are sufficient to give UPitt and its attorneys evidentiary support to claim UPitt "is the owner of the entire right, title and interest" in the patents-in-suit. *See* Docket No. 1 (Complaint), ¶5.

Varian challenges this assertion, claiming that Carnegie Mellon University ("CMU") is a

joint owner, and as such, UPitt's Complaint is false.[1]  But, Varian's argument fails.

The patents-in-suit were created under a collaborative research project between UPitt and CMU; and, policies were created for joint development projects between these institutions.  *See* Varian's Rule 11 Motion, Exhs. A-B.  These policies outlined the intent of the two institutions, when read in their entirety.  For the collaborative project that resulted in the patents-in-suit, UPitt was identified as the institution with "the sole responsibility for commercialization of the IP disclosures."  *See* Varian's Rule 11 Motion, Exh. A at §F(2), Exh. B at §F(2); Varian's MSJ, Exh. I at 93:25-95:21.  Yet, before UPitt could begin commercializing the patents-in-suit, it needed legal title.  Hence, the inventors, with CMU's knowledge, made the assignment to UPitt.  *See* Varian's MSJ, Exhs. K-L (Assignments); Exh. I (Wooldridge Depo.) at 101:15-102:22.

While the policies state that all IP jointly developed would be jointly owned by UPitt and CMU, that joint ownership was subject to administration under the policy.  That same policy provided instruction for assigning legal title once an institution was identified as having the sole responsibility for commercialization.  Without legal title of the patents resting in one institution, that institution cannot be solely responsible for commercializing the IP.  Thus, when UPitt was given the sole responsibility of commercializing the patents, it was given legal title through the written assignments from the inventors.  For over ten years, CMU knew about this transfer of title and did nothing to change the result.[2]

---

[1] *See* Docket Nos. 127-128 (Varian's Summary Judgment Motion), Docket Nos. 153 & 159 (Varian's Reply to UPitt's Opposition to Summary Judgment Motion), Docket No. 162 (Response to Rule 19 Motion), Docket No. 256 (Varian's Objection to Special Master's Report and Recommendation), Docket No. 271 (Varian's Reply to UPitt's Response to Special Master's Report and Recommendation).

[2] Ownership in a patent may only be transferred through a written instrument.  *See* 35 U.S.C. §261.  Thus, when the inventors assigned the patents to UPitt, it was done as required by law.  To the extent that the Special Master or Varian believes CMU should also be an owner, that issue is for CMU and UPitt to resolve, for example, through inter-institutional agreements.  Yet, CMU

At most, CMU retained a fiduciary interest in any benefits generated through UPitt's commercialization efforts for exclusive rights. CMU does not have legal title to the patents-in-suit. According to the policies, CMU could only gain legal title in the patents-in-suit if UPitt chose to "turn back a Disclosure [*i.e.,* the patents-in-suit] to the inventors." *See* Varian's Rule 11 Motion, Exh. A at §F(2). UPitt never made that choice; thus, CMU never had the opportunity to obtain legal title of the patents-in-suit.

While UPitt is solely responsible for the commercialization of the patents-in-suit, the collaborative nature of the project promoted open communication with CMU, consistent with the joint policies. Thus, UPitt kept CMU informed and even sought its input for the commercialization efforts. This included consulting with CMU when a third-party considered exclusively licensing the patents-in-suit, which could cap the maximum benefit received from commercialization of the IP. Given that the intent of the policy was collaborative, and specifically stated that both UPitt and CMU should be "sensitive and responsible to any special circumstances . . . of the other university, and will consult with the other [university] on such issues," UPitt consulted with CMU. Yet, consulting with the other institution and being sensitive to its interest does not transfer legal title to the patents-in-suit. Rather, UPitt was, and is, the holder of "legal title" to the patents-in-suit, and as such, the entity with standing to sue Varian for patent infringement. *See Arachnid, Inc. v. Merit Industries, Inc.,* 939 F.2d 1574, 1579 (Fed. Cir. 1991) ("The general rule is that one seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held *legal title* to the patent *during the time of*

---

has not raised any such concern. Rather, CMU continues to follow the Joint Policies and does not interfere with UPitt's commercialization efforts. Moreover, CMU understands that the inventors will be compensated by UPitt, not CMU, from any proceeds as a result of UPitt's commercialization efforts. *See* (Docket Nos. 270 and 272) [SEALED] Appendix A (Wooldridge Depo.), at 105:14-110:19.

*the infringement*.") (emphasis in original).

In addition, the joint policies contemplated with respect to allocation determinations that, "[a]ll such discussions, agreements, and resolutions of differences are to be dealt with in the same manner which is customary or [sic] 'normal' for invention disclosures within each university." Varian's Rule 11 Motion, Exh. A at §E(2)(a), Exh. B at §E(2)(a). An Allocation Agreement is developed to record those discussions between the Technology Transfer Offices. The record reflects that UPitt and CMU did in fact open discussions and reach an agreement with regard to Allocation of Proceeds in 2002, when Varian was negotiating with UPitt for a license to the patents-in-suit. Since this license never went forward, the Agreement never was finalized.

### III. UPITT AND VARIAN HAVE A LONG HISTORY REGARDING THE PATENTS-IN-SUIT, WHICH CULMINATED IN UPITT FILING SUIT.

The patents-in-suit were filed in 1996, and issued in 1998. Before the patents were filed, UPitt and Varian entered a confidentiality agreement in 1994. Under this agreement, UPitt disclosed the concepts that eventually matured into the patents-in-suit. UPitt and Varian entered a second confidentiality agreement in May 1997 where UPitt disclosed the inventions that are the subject of the patents-in-suit with the expectation that Varian would collaborate on grants or collaborate on sponsored research with UPitt in the area of conformal radiotherapy. Varian, however, after receiving the confidential disclosures which resulted in the patents-in-suit, suddenly discounted UPitt's innovations and refused to further collaborate as a research partner. Thus, UPitt was surprised when it learned in a 1999 announcement that Varian was introducing a video monitoring system with respiratory gating for use in radiotherapy treatment. However, upon review of the then available documentation, UPitt did not find sufficient evidence to have an objectively reasonable basis to assert an infringement claim. Hence, it did not file a complaint at that time.

UPitt and Varian began negotiating a license for the patents-in-suit in May 2002. Yet, in the end, Varian declared it had no interest in pursuing a license.

In October, 2004, Varian issued a press release announcing that its Trilogy TX System was installed at Emory University. In October, 2005, Varian approached UPitt about taking a non-exclusive license to the patents-in-suit. UPitt's Office of Technology Management offered several term sheets to Varian over the course of a year. But, Varian quickly revealed that it considered the patents-in-suit nothing but a "nuisance" and would not accord any reasonable value to the inventors' hard work. During these negotiations, Varian claimed that it did not have any products that practiced the patents-in-suit, and was only interested in a small lump sum license payment to avoid any infringement suit. By July of 2006, the impasse was referred to UPitt's Office of General Counsel for further review and investigation. UPitt then made a final offer to Varian in November, 2006. Varian refused UPitt's last offer in December 2006, so UPitt engaged outside counsel to further assess the case.

In early 2007, UPitt's attorneys again reviewed the claims, written description, and prosecution histories for the patents-in-suit. UPitt's attorneys also interpreted and analyzed claims from the patents-in-suit, and compared those claims to publicly available information regarding Varian's products. They determined that Varian's products infringed. As issued patents, having been examined by a competent examiner at the United States Patent and Trademark Office, the patents-in-suit were presumed valid according to 35 U.S.C. § 282. Also, UPitt's attorneys confirmed that UPitt was the sole entity with legal title to the patents-in-suit. After reaching these conclusions, UPitt filed suit on April 13, 2007.[3]

---

[3] Should the court require an *in camera* inspection of privileged documents reflecting UPitt's pre-filing investigation, UPitt is willing to provide those documents. However, UPitt maintains

### IV. UPITT'S ACTIONS ARE NOT SANCTIONABLE BECAUSE THEY DO NOT RISE TO AN "EXCEPTIONAL CIRCUMSTANCE".

The law of the regional circuits governs any Rule 11 determination. *See Intamin, Ltd. v. Magnetar Tech. Corp.*, 483 F.3d 1328, 1337 (Fed. Cir. 2007) (applying "the law of the regional circuit in its review" of a Rule 11 decision). Varian claims that "reasonableness under the circumstances" is the appropriate standard, but this is nothing more than a quote from Rule 11. The Third Circuit applies this standard by awarding sanctions only in "exceptional circumstances." *See Napier v. Thirty or More Unidentified Federal Agents*, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (finding exceptional circumstances for claims that were clearly precluded by the statute of limitations and judicial estoppel); *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 483 (3d Cir. 1987) (finding that losing the case was not an exceptional circumstance); *Mellon Bank v. Deluxe Data Sys., Inc.*, No. 95-1768, 1997 U.S. Dist. LEXIS 21979, at *4 (W.D. Pa. June 27, 1997) (finding that a claim must be patently unmeritorious or frivolous for it to be an exceptional circumstance). The Third Circuit is mindful that when performing this calculus all circumstances must be considered and that hindsight must not influence the analysis, as the relevant time is when the paper was submitted. *See CTC Imports and Exports v. Nigerian Petroleum Corp.,* 951 F.2d 573 (3d Cir. 1991). There are no special pre-filing investigation requirements for patent infringement cases. *See, e.g., Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.,* 351 F.3d 1139, 1150 (Fed. Cir. 2003). What is required under Rule 11, however, is that before a patent infringement suit is filed, an attorney must (a) interpret the asserted patent claims and (b) compare the accused device(s) or method(s) with those claims. *See Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300-01 (Fed. Cir. 2004).

---

that all of these documents are protected by the attorney work product doctrine, and some are also protected by the attorney-client privilege.

### A. UPitt is the sole legal title holder to the patents-in-suit and therefore has it standing to sue and claim such ownership.

UPitt's reasonable belief that it owns the patents-in-suit is supported by the evidence. The assignments, the Joint IP Policy Guidelines, and UPitt's ongoing collaborative relationship with CMU, all indicate in unmistakable terms that UPitt has legal title to the patents-in-suit and therefore – standing to sue. Any rights that CMU retains relate not to ownership, but to proceeds, because the inventors assigned "right, title, and interest in and to" the patents-in-suit to UPitt. Varian simply has no basis for establishing the exceptional circumstances required by the Third Circuit to justify sanctions under Rule 11.

Varian further argues that UPitt's answer to Defendant's Interrogatory 1 is another basis for application of Rule 11. Rule 11 does not govern responses to interrogatories. *See Project 74 Allentown, Inc. v. Frost*, 143 F.R.D. 77, 83 n.8 (E.D. Pa. 1992) ("Answers to discovery requests, (i.e. answers to interrogatories) are not governed by Rule 11 . . . ."); *Syntex Pharm. Int'l, Ltd. v. K-Line Pharm., Ltd.*, Nos. 85-2814, 85-2949, 1988 U.S. Dist. LEXIS 11420, at *8 (D.N.J. 1988) ("[I]t is fair to infer that unfounded or incomplete answers to interrogatories were not within the Rule 11 framers' intent"). Even if interrogatories are subject to Rule 11 analysis, UPitt's Response, as well as its Supplemental Response, to Interrogatory 1 contained objections that the interrogatory is, among other things, overly broad and vague. *See* Varian's Rule 11 Motion, Exhs. D-E. UPitt answered the Interrogatory to the best of its ability to understand Defendant's inquiry, and provided information regarding the history of licensing discussions regarding the patents-in-suit. Moreover, this issue has already been debated, and resolved by the Court ordering UPitt to supplement its interrogatory responses by March 28.

### B. UPitt and its attorneys adequately investigated Varian's infringement before filing suit.

UPitt's diligence and reasonableness cannot be reasonably challenged. When UPitt first

believed Varian could be infringing the 554 Patent, it requested that its patent counsel evaluate the evidence on hand. UPitt's counsel was well aware of the written description, the patents' claims, and the prosecution history, and thus was able to analyze the claims and compare them to the available information. After performing this work, UPitt decided there was not sufficient evidence to assert infringement. Thus, UPitt was mindful that it must satisfy its pre-filing investigation, and did not file suit. *See, Q-Pharma,* 360 F.3d at 1300-01.

From 1998 to 2001, UPitt had engaged Elekta Oncology Systems, a competitor of Varian, as a research partner. Pursuant to the sponsored research agreement, Elekta had an exclusive option for an exclusive license to the patents-in-suit. As UPitt is not in the business of manufacturing medical equipment and devices and had no notice from Elekta that infringing products were on the market, UPitt took no further action at this time.

As time progressed, so did Varian's infringing activities. As Varian released more information to the public, UPitt was able to perform a more exhaustive infringement analysis to the accused devices. UPitt's attorneys again reviewed and analyzed the claims, written description, and prosecution histories of both patents-in-suit, and analyzed these claims against the then available public information. After this review, UPitt determined that Varian's products infringed the patents-in-suit; and UPitt filed suit in April 2007.

UPitt was required to do no more, and in fact far exceeded the minimum required by law. *See id.* at 1300-02 (finding no sanctionable conduct when the attorneys analyzed the claims, written description, and prosecution histories, and compared the claims to the accused products based on publicly available information). Varian cannot reasonably claim that UPitt's pre-filing investigation rises to an "exceptional circumstance." Thus, Varian's motion should be denied. *See, e.g., Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 483 (3d Cir. 1987) (finding that losing the case

was not an exceptional circumstance); *Mellon Bank,* 1997 U.S. Dist. LEXIS 21979, at *4 (finding that a claim must be patently unmeritorious or frivolous for it to be an exceptional circumstance).

## V. VARIAN'S 35 U.S.C. § 285 CLAIM FAILS AS THERE IS NEITHER A PREVAILING PARTY NOR A RULE 11 VIOLATION.

Varian's attempt to seek attorneys' fees under 35 U.S.C. § 285 is premature and lacks support under the requisite standard of review. First, for a case to be deemed exceptional under § 285, there must be a prevailing party. 35 U.S.C. § 285 ("The court in exceptional cases may award reasonable attorney fees to the *prevailing* party.") (emphasis added); s*ee also MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1380 (Fed. Cir. 2005) (explaining that there is technically no prevailing party where there has not been a final resolution of the case). As the Court is well aware, UPitt's claims of infringement by Varian have not yet been resolved so there is no prevailing party. Therefore, any application for fees pursuant to § 285 is premature.

Even assuming there is a prevailing party, Varian's application for § 285 fees fails because, contrary to what Varian wants the Court to believe, a motion under § 285 is not evaluated under the same standard and case law as a Rule 11 motion. *See Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1368 (Fed. Cir. 2007) ("Motions under Rule 11 and § 285 are different."). Rather, as Varian fails to mention and apply in its brief, § 285 motions are analyzed under Federal Circuit precedent, not the law of regional circuits, and require the movant to show by clear and convincing evidence that the case is exceptional. *Id.* at 1368.

Here, Varian improperly relies on Rule 11 case law to argue that this case should be deemed exceptional. *See* Varian's Motion at 8-9 (citing cases from various regional circuits analyzing Rule 11). This attempt to meld Rule 11 and § 285 law is unavailing and should be

rejected.  *See Digeo*, 505 F.3d at 1368 n.11 (explaining that the plaintiff's "attempt to graft Rule 11 precedent onto § 285 case law is unpersuasive").  Under the correct standard, even if Varian establishes a Rule 11 violation under the law of the Third Circuit, it still remains with Varian to show by clear and convincing evidence that this is an exceptional case under § 285 and applicable Federal Circuit case law.  Here, Varian cannot make the required showing under § 285 because it has failed to come forward with non-frivolous allegations for Rule 11 sanctions.  Without the requisite level of support, in terms of both fact and precedent, Varian's motion for fees under § 285 fails, even if not deemed premature.

## VI. VARIAN'S BASELESS REQUEST FOR SANCTIONS IS ITSELF SANCTIONABLE.

Varian has no basis for a fee award but rather UPitt should be awarded its fees for responding to Varian's vexatious Rule 11 threats and this Motion.  Under 28 U.S.C. § 1927:

> Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.  Accordingly, courts in this circuit award fees under § 1927 where the movant's actions have multiplied the proceedings.  *See In re Prudential Ins. Co. Am. Sales Practice Litig. Actions*, 278 F.3d 175, 188 (3d Cir. 2002); *Baker Indus. v. Cerberus Ltd.*, 764 F.2d 204, 208 (3d Cir. 1985).  Moreover, courts in this circuit recognize that Rule 11 motions are not to be brought lightly, and should not be used for the improper purpose of litigation strategy.  *See Gaiardo*, 835 F.3d at 485 ("The use of Rule 11 as an additional tactic of intimidation and harassment has become part of the so-called 'hardball' litigation techniques espoused by some firms and their clients.  Those practitioners are cautioned that they invite retribution from courts which are far from enchanted with such abusive conduct.").  The misuse of a Rule 11 motion may warrant sanctions against the movant, which a court may impose "on its own initiative."

*See id.* (citing *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 157 (3d Cir. 1986)).

Here, Varian should be sanctioned for its use of Rule 11 to harass and multiply the proceedings against UPitt. Not only has Varian used Rule 11 to threaten and intimidate UPitt repeatedly over the course of this litigation, it has sunk to a new low and relied on Rule 11 as an improper basis to file this Motion, which lacks support in fact and law. This Motion, as is evident from its heavy reliance on past pleadings, is merely a regurgitation of the same arguments raised in numerous previous discovery motions, claim construction briefs, and the pending summary judgment motion for standing. Accordingly, UPitt respectfully requests leave to file with the Court its documentation for support of the significant fees billed to UPitt for responding to Varian's multiple Rule 11 threats and the instant Motion.

DATED:  March 27, 2008                     /s/ Daniel Johnson, Jr.
                                           Daniel Johnson, Jr. (*pro hac vice*)
                                           Rita E. Tautkus (*pro hac vice*)
                                           Darcy Paul (*pro hac vice*)
                                           MORGAN, LEWIS & BOCKIUS LLP
                                           2 Palo Alto Square, Suite 700
                                           3000 El Camino Real
                                           Palo Alto, CA  94306
                                           (650) 843-4000
                                           (650) 843-4001 (facsimile)
                                           djjohnson@morganlewis.com
                                           rtautkus@morganlewis.com
                                           dpaul@morganlewis.com

                                           David W. Marston Jr. (Pa ID No. 84399)
                                           MORGAN, LEWIS & BOCKIUS LLP
                                           1701 Market Street
                                           Philadelphia, PA  19103
                                           (215) 963-5937
                                           (215) 963-5001 (facsimile)
                                           dmarston@morganlewis.com

                                           Christopher K. Ramsey (Pa ID No. 63293)
                                           MORGAN, LEWIS & BOCKIUS LLP
                                           One Oxford Centre, 32nd Floor
                                           Pittsburgh, PA  15219

(412) 560-3300
(412) 560-7001 (facsimile)
cramsey@morganlewis.com

Attorneys for Plaintiff
University of Pittsburgh